UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2007 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>PATRICK ANTHONY MCGOWAN,<br>CHARLES ROBERT VANCE,<br>SCOTT DREW,<br>RANDALL PAUL KRUSKA, and<br>KAREN MONTOYA,<br><br>            Defendants. | CR No. 08- **CR08- 01116**<br><br>**I N D I C T M E N T**<br><br>[18 U.S.C. § 371: Conspiracy;<br>42 U.S.C. § 408(a)(7)(B): False<br>Representation Of Social<br>Security Number; 18 U.S.C.<br>§ 1028(a)(7): Identity Fraud;<br>18 U.S.C. § 1001(a)(1), (2):<br>Falsification And Concealment<br>Of Material Facts Within<br>Federal Agency Jurisdiction;<br>18 U.S.C. § 2: Aiding And<br>Abetting And Causing An Act To<br>Be Done] |

The Grand Jury charges:

//
//
//
//
//

SAC:sac

1

**COUNT ONE**

[18 U.S.C. § 371]

I.

**INTRODUCTORY ALLEGATIONS**

A.   **THE DEFENDANTS AND THEIR EMPLOYER**

1.   During the time relevant to this Indictment:

a.   Ralphs Grocery Company ("Ralphs") was an Ohio corporation headquartered in Compton, California, whose principal business was operating supermarkets in California under the "Ralphs" and "Food 4 Less" banners.  Ralphs was indirectly owned and controlled by The Kroger Co. ("Kroger"), a publicly-traded Ohio corporation headquartered in Cincinnati, Ohio, which operated grocery and retail stores throughout the United States.

b.   Ralphs operated approximately 300 supermarkets in Southern California.

c.   Ralphs' principal competitors in Southern California were Albertsons, Inc. ("Albertsons") and Vons, a Safeway Company ("Vons"), which included Vons supermarkets operated under the "Pavilions" banner.

d.   Ralphs employed approximately 19,000 grocery clerks and meat cutters (collectively, "grocery workers") to staff its Southern California stores.  Almost all of these employees were members of one of seven local unions of the United Food and Commercial Workers Union, AFL-CIO-CLC (collectively, the "Unions"; individually, the "Union").

e.   Ralphs stores were grouped into Zones, each of which was headed by a Zone Manager.  Each Zone consisted of between approximately 18 to 20 stores.  Each Ralphs store was

2

1  managed by a Store Director, who reported to his or her Zone

2  Manager, and was assisted in most instances by a Manager of

3  Operations.  Zone Managers, Store Directors, and Managers of

4  Operations were non-union employees.

5          f.   Zones were grouped into one of three Divisions:

6  Southern, Central, and Northern.  Each Division was headed by a

7  Group Vice-President.  Zone Managers reported to their respective

8  Group Vice-President.  The three Group Vice-Presidents reported

9  to the Executive Vice President for Store Operations, who, in

10  turn, reported to the President of Ralphs.

11      2.   Defendant PATRICK ANTHONY MCGOWAN (hereinafter

12  "MCGOWAN") began his employment at Ralphs in 1975.  MCGOWAN

13  subsequently held several different positions, including Store

14  Director and Zone Manager (formerly known as a "District

15  Manager").  MCGOWAN became a Group Vice President for Ralphs in

16  2000.  In March 2003, MCGOWAN became the Group Vice President,

17  Southern Division, at Ralphs.  As Group Vice-President, Southern

18  Division, MCGOWAN was responsible for managing the operations of

19  approximately one hundred-twenty Ralphs grocery stores located in

20  Los Angeles, San Bernardino, Riverside, Orange County, and San

21  Diego counties.

22      3.   Defendant CHARLES ROBERT VANCE ("VANCE") began his

23  employment with Ralphs in 1968.  VANCE subsequently held several

24  different positions at Ralphs, including Store Director.  VANCE

25  became a Zone Manager in or about 1989.  In 2003 and 2004, VANCE

26  was the Zone Manager for Zone 3, which included twenty Ralphs

27  stores in Riverside and San Bernardino Counties.  As the Zone

28  Manager for Zone 3, VANCE reported directly to MCGOWAN.  As a

1   Zone Manager, VANCE was responsible for supervising the

2   operations and management of the Ralphs stores in his zone.

3        4.   Defendant SCOTT DREW ("DREW") began his

4   employment with Ralphs in 1977.  DREW subsequently held several

5   different positions at Ralphs, including Store Director.   DREW

6   became a Zone Manager for Ralphs in or about 2000.   In 2003 and

7   2004, Drew was the Zone Manager for Zone 4, which included twenty

8   Ralphs stores in the areas of West Los Angeles, Hollywood, and

9   Malibu, within the Central Division of Ralphs.  As a Zone

10  Manager, Drew was responsible for supervising the operations and

11  management of the Ralphs stores in his zone.   In late 2005, Drew

12  was promoted within the Kroger organization to the position of

13  Vice President for Store Operations, Central Division, in

14  Indianapolis, Indiana.

15       5.   Defendant RANDALL PAUL KRUSKA ("KRUSKA") began his

16  employment with Ralphs in 1972.  KRUSKA subsequently held several

17  different positions at Ralphs, including Store Director.   KRUSKA

18  became a Zone Manager for Ralphs in or about 1998.  In the summer

19  of 2003, KRUSKA became the Zone Manager for Zone 1, which

20  included eighteen Ralphs stores in Riverside and San Diego

21  Counties, within the Southern Division of Ralphs.  As the Zone

22  Manager for Zone 1, KRUSKA reported directly to MCGOWAN.  As a

23  Zone Manager, KRUSKA was responsible for supervising the

24  operations and management of the Ralphs stores in his zone.

25       6.   Defendant KAREN MONTOYA ("MONTOYA") began her

26  employment with Alpha Beta grocery stores in or about 1976.

27  Alpha Beta merged with Ralphs in or about 1995.  Following the

28  Alpha Beta-Ralphs merger, MONTOYA served as a Store Director at

1  Ralphs.  MONTOYA became a Zone Manager for Ralphs in or about
2  2002.  In 2003 and 2004, MONTOYA was the Zone Manager for Zone 6,
3  which included twenty-three Ralphs stores located in Orange
4  County, California, within the Southern Division of Ralphs.  As
5  the Zone Manager for Zone 6, MONTOYA reported directly to
6  MCGOWAN.  As a Zone Manager, MONTOYA was responsible for
7  supervising the operations of the Ralphs stores in her zone.

8  **B.**   **THE NATIONAL LABOR RELATIONS ACT, COLLECTIVE BARGAINING, AND**
9        **LOCKOUTS**

10      7.   The National Labor Relations Act ("NLRA") is the
11  primary law governing relations between labor organizations (such
12  as unions) and employers whose operations affect interstate
13  commerce.

14      8.   Section 7 of the NLRA (Title 29, United States Code,
15  Section 157) creates in employees certain rights, including: the
16  right to organize, to join, and to assist a labor organization;
17  the right to bargain collectively with their employer through a
18  representative of their own choosing; and the right to engage in
19  concerted activities for purposes of collective bargaining and
20  mutual aid and assistance, such as to strike and picket their
21  employer.

22      9.   The NLRA imposes on an employer and the employees'
23  bargaining representative the mutual obligation to meet at
24  reasonable times and confer in good faith in negotiating a
25  written agreement regarding the wages, hours, and other terms and
26  conditions of employment of represented employees.  Such an
27  agreement is known as a "collective bargaining agreement" and the
28  employees covered by such an agreement are referred to as

"bargaining unit members."

10.   Unions may bargain together on behalf of their respective memberships in a "multi-union bargaining unit." Employers may likewise bargain together in a "multi-employer bargaining unit."  Employers in a multi-employer bargaining unit may, within certain limits, coordinate their activities for purposes of responding to a labor action or the threat of one.

11.   During negotiations to produce a new collective bargaining agreement, and as part of its obligation to bargain in good faith, an employer may not (with limited exceptions) unilaterally change the terms and conditions of employment as specified in an expired collective bargaining agreement, unless or until an "impasse" in negotiations is declared.  Before an impasse in negotiations is declared, such unilateral changes, in the absence of a legitimate business justification or exigent circumstances, constitute unfair labor practices in violation of Section 8(a)(5) of the NLRA.

12.   A lockout is the withholding of employment by an employer from its employees, usually for the purpose of creating and maintaining economic pressure on the union and its membership to accept the employer's lawful bargaining position.  A lockout, if conducted properly, is a lawful bargaining tactic that may serve as the employer's response to a threatened or actual strike.

13.   An employer may continue to operate its business during a lockout by hiring temporary replacement workers who are not union members.  An employer generally may not retain or rehire bargaining unit members to work as temporary replacement workers.

Retaining or rehiring bargaining unit members as temporary replacement workers, in the absence of a legitimate business justification or exigent circumstances, constitutes an unfair labor practice in violation of Sections 8(a)(1) and (a)(3) of the NLRA.

14.  A "selective" lockout, also known as a "partial" lockout, occurs when an employer retains or rehires only some of the bargaining unit members it has locked out.

15.  An employer that declares a total lockout of all or a defined group of bargaining unit members may not act inconsistently with that declaration and selectively retain or rehire only some of the otherwise locked-out bargaining unit members.  Such inconsistent conduct, in the absence of a legitimate business justification or exigent circumstances, constitutes an unfair labor practice in violation of Sections 8(a)(1) and (a)(3) of the NLRA.

16.  An employer that selectively retains or rehires only some members of a locked-out bargaining unit during negotiations toward a new collective bargaining agreement (even if such selective retention or rehiring is otherwise proper) must adhere to most of the terms and conditions of the expired collective bargaining agreement.  Unilaterally changing the terms and conditions of employment of such retained or rehired bargaining unit members, in the absence of a legitimate business justification or exigent circumstances, constitutes an unfair labor practice in violation of Sections 8(a)(1), (a)(3), and (a)(5) of the NLRA.

**C.   PRE-STRIKE NEGOTIATIONS BETWEEN RALPHS, ALBERTSONS, VONS, AND THE UNIONS TOWARD A NEW COLLECTIVE BARGAINING AGREEMENT**

17.   On or about October 5, 2003, a collective bargaining agreement (the "old collective bargaining agreement") between, on the one hand, Ralphs, Albertsons, Vons, and Stater Brothers Markets (collectively, the "Food Employers"), and, on the other hand, the Unions, was due to expire.

18.   The old collective bargaining agreement governed the terms and conditions of employment for grocery clerks, meat cutters, and pharmacists employed by the Food Employers, including: hourly wage rates for different classifications of employees; premium pay for overtime hours and hours worked on holidays; minimum hours for part-time and full-time employees; seniority rules; vacation pay; transfers between stores and geographic areas; layoffs and reinstatement following a layoff; and discharge for cause.

19.   During the Summer of 2003, Ralphs, Albertsons, Vons, and the Unions began negotiations toward a new collective bargaining agreement.

**D.   THE SECRET MUTUAL STRIKE ASSISTANCE AGREEMENTS**

20.   On or about September 5, 2003, Ralphs, Albertsons, and Vons (collectively, the "Three Employers") entered into two virtually identical "Mutual Strike Assistance Agreements" (collectively, the "Assistance Agreements").   The Assistance Agreements were intended to be, and were, kept secret from the Unions.

21.   The Assistance Agreements provided for close coordination and communications between the Three Employers in

negotiating with the Unions and in responding to a strike against one of the Three Employers.  The Assistance Agreements provided, among other things, that:

      a.   "In the event an Employer signatory to this Agreement is struck by the Unions . . . and other Employers are not struck, the signatory Employers shall, within 48 hours, lock out all employees represented by the Unions"; and

      b.   "[T]he existence of this Agreement is to remain confidential at all times and under no circumstances to be disclosed to the Union, except as required by law or legal processes."

    22.  The Assistance Agreements also provided "a mechanism for sharing certain costs of a strike or lockout among the Employers."  The amount of any cost-sharing payments to be made by any of the Three Employers was to be calculated by a public accounting firm, selected by the Three Employers, pursuant to a formula specified in the Assistance Agreements.  The formula adjusted revenue among the Three Employers by comparing the revenue of each of the Three Employers during the eight weeks immediately preceding a strike with their respective revenue during and shortly after the strike.

    23.  Under the Assistance Agreements, if the Unions struck one of the Three Employers, the other two were obligated to lock out their employees.  To ensure that an employer did not hire striking or locked-out employees of another employer as temporary replacement workers, the Three Employers agreed to exchange identifying information regarding their respective grocery workers, so that each employer would be able to determine whether

9

or not an applicant for a temporary replacement position was
actually a union member employed by one of the other employers.

**E.   THE STRIKE/LOCKOUT**

24.   On or about October 5, 2003, the old collective
bargaining agreement expired without the Three Employers and the
Unions having negotiated a new agreement.

25.   On or about October 8, 2003, the membership of the
Unions voted overwhelmingly to reject the new collective
bargaining agreement proposed by the Three Employers, and
authorized the Unions to call a strike if necessary.

26.   On or about October 11, 2003, the Unions struck Vons
and began picketing Vons stores.

27.   On or about October 11, 2003, pursuant to the
Assistance Agreements, Ralphs' Director of Labor Relations sent
letters to the Presidents of all seven Unions advising that
effective 6:00 a.m. on October 12, 2003, Ralphs Supermarkets
would lock out bargaining unit members, with the exception of
pharmacists.  The letter further advised that bargaining unit
employees would be allowed to return to work when the strike
against Vons concluded.

28.   On or about October 12, 2003, Ralphs and Albertsons, in
accordance with the terms of the secret Assistance Agreements,
locked-out all of their grocery clerks and meat cutters (but not
pharmacists) who were members of the seven Unions.  The Unions
thereafter began picketing Ralphs and Albertsons stores.

29.   Ralphs, Albertsons, and Vons all continued to operate
their stores during the strike/lockout using temporary
replacement workers, as well as non-union management and other

1  personnel brought in temporarily from other divisions.

2       30.  On or about October 31, 2003, the Unions stopped

3  picketing Ralphs stores, which resulted in a substantial increase

4  in business at most Ralphs stores.  Because Ralphs' senior

5  management was not expecting the Unions to stop picketing, Ralphs

6  was ill-prepared for the increase in business at these stores.

7  The resulting substantial increase in business at Ralphs stores

8  caused many legitimate temporary replacement workers to resign or

9  simply stop going to work, thereby further aggravating the

10 staffing needs at many Ralphs stores.

11      31.  During the lockout and especially after the Unions

12 stopped picketing Ralphs stores, Ralphs needed several hundred

13 well-trained, experienced, and reliable grocery workers who

14 could: (a) operate its stores by competently and efficiently

15 performing necessary functions, such as receiving, bookkeeping,

16 price integrity, stocking, rotating and displaying produce, and

17 cutting and displaying meat; and (b) train and supervise

18 temporary replacement workers to perform these functions.  These

19 temporary replacement workers were needed to avoid closing

20 stores, or reducing store hours, for the duration of the lockout

21 and the expected permanent loss of customers and revenue that

22 would result from such events.  Due in large part to the fact

23 that the strike and lockout involved Ralphs and its two largest

24 competitors in Southern California, that is, Vons/Pavillions and

25 Albertsons, the majority of experienced grocery workers in the

26 Southern California region were members of the striking Unions

27 and could not be legitimately hired as temporary replacement

28 workers at Ralphs.

32.   On or about February 26, 2004, the Three Employers and the Unions entered into a "Labor Dispute Settlement Agreement." On or about February 28 and 29, 2004, the membership of the Unions voted to ratify the new CBA proposed by the Three Employers (the "new collective bargaining agreement").   On or about March 1, 2004, striking Vons and locked-out Ralphs and Albertsons employees began returning to work.

33.   In the new collective bargaining agreement, Ralphs achieved all of its primary bargaining objectives, including over $200 million in estimated wage, health care and pension cost savings.

## F.   RALPHS' HIRING OF TEMPORARY REPLACEMENT WORKERS

34.   In order to hire a temporary replacement worker, the following documents had to be completed by the applicant and received at the Ralphs Grocery store at which the applicant desired to work:

a.   Temporary Work Employment Application:   This form required the applicant to state, among other things, his or her name, social security number, current and/or latest employment, and whether he or she had ever previously worked for Ralphs.   It also required the applicant to certify that "the information and answers given by me in this Employment Application are true and correct to the best of my knowledge[.]"

b.   Payroll Authority - Temporary Employee:   This form was typically completed by the Store Director and signed by the applicant.   It required, among other things, the applicant's name and social security number.   It also asked whether the applicant had previously worked for Ralphs.

c.   INS Form I-9, Employment Eligibility Verification: Ralphs was required by law to complete this form for all new hires, including temporary replacement workers.

i.   Section 1 of the form had to be completed by the applicant.  It required the applicant to list, among other things, his or her name, date of birth, social security number, and address.  It also required the applicant to attest that he or she was "aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with completion of this form."

ii.   Section 2 of the form had to be completed by the Store Director.  It required the Store Director to verify the applicant's identity and eligibility to work by personally examining certain acceptable forms of identification documents, and to record information about each document examined.  It also required the Store Director to sign a "Certification," by which the Store Director "attest[ed], under penalty of perjury, that [he or she had] examined the [identification] document(s) presented by the above-named employee, [and] that the above-listed document(s) appear to be genuine and to relate to the employee named[.]"

d.   IRS Form W-4, Employee's Withholding Allowance Certificate:  Each applicant was required by law to complete this form and to sign it under penalty of perjury.  It required the applicant to list, among other things, his or her name, social security number, and address, as well as the total number of allowances claimed for federal income tax purposes.

35.  Before a temporary replacement worker was formally

hired and entered into the Ralphs' electronic timekeeping and computerized payroll systems, certain information had to be entered into the Ralphs Human Resources Information System ("HRIS") by a member of the store's non-union management team. This information included: the applicant's name, social security number, date of birth, and home address; whether the applicant was a union member; and whether the applicant was eligible to receive health, pension, and other welfare benefits.

36.   If an applicant was an existing Ralphs employee, HRIS would so indicate when the applicant's social security number was entered and would not permit the hiring process to continue under that social security number.

37.   Once the applicant's information was entered into the HRIS system, the temporary work employment application, payroll authority, Form I-9, and Form W-4, were sent to the personnel department at Ralph's corporate headquarters in Compton, California.

## G.   OVERVIEW OF CRIMINAL CONDUCT

38.   During the lockout, defendants MCGOWAN, VANCE, DREW, KRUSKA, and MONTOYA, together with their co-conspirators at Ralphs (collectively "the Conspirators"), engaged in a course of criminal conduct involving the hiring of locked-out employees under false names, social security numbers, and documentation, which was intended to, and did, undermine the labor action by alleviating the economic incentives on the employers, including Ralphs, to end the labor dispute by negotiating a new collective bargaining agreement in a timely manner.  As described further below, as part of this course of criminal conduct, the

Conspirators:

a.   selectively recruited locked-out employees to secretly return to work as temporary replacement workers under false identities;

b.   covertly hired and employed hundreds of locked-out employees to work during the lockout under: (i) names and social security numbers of other people or (ii) fictitious or altered names and social security numbers;

c.   implemented and furthered a corporate policy that, as applied, permitted, encouraged, condoned, and deliberately ignored the hiring of locked-out employees under false names and social security numbers;

d.   caused Ralphs Store Directors to falsely complete government verification of identity and eligibility to work forms (known as INS Forms I-9) for locked-out employees hired under false identities, falsely attesting in these forms that they had personally examined genuine identification documents presented by such employees;

e.   caused locked-out employees who agreed to return to work during the lockout to falsely complete government tax withholding allowance certificates (known as IRS Forms W-4) using false names and social security numbers;

f.   generated thousands of false hiring and employment records for locked-out employees who were rehired under false names and social security numbers to work during the lockout;

g.   caused Ralphs to issue hundreds of weekly payroll checks from its headquarters in Compton, California to locked-out employees in the false names they were using, and then allowed

15

these employees to cash the checks at Ralphs stores;

h.   acted to conceal their hiring of locked-out employees from the Unions by, among other things, assigning locked-out employees to work at stores far from the stores at which they regularly worked and moving locked-out employees to new stores when they were seen working by Union members;

i.   caused Ralphs to issue hundreds of false IRS Forms W-2 to locked-out employees who had worked under false names and social security numbers, and submitted copies of these false forms to the Social Security Administration ("SSA"), which thereafter furnished them to the Internal Revenue Service ("IRS"); and

j.   caused Ralphs to submit dozens of false Remittance Reports to two joint employer-union administered employee benefit funds (collectively, the "Funds"), which omitted thousands of hours worked at Ralphs stores during the lockout by secretly rehired locked-out and striking employees.

39.   The hiring of locked-out workers under false names and social security numbers caused Ralphs to contribute substantially less than was required to the two joint employer-union administered benefit funds for the locked-out workers who worked during the lockout under false identification information because the required contributions were calculated based upon the number of hours worked by the employee on a monthly basis.

## II.

## THE OBJECTS OF THE CONSPIRACY

40.   Beginning in or before August 2003 and continuing until at least March 2005, within the Central District of California

and elsewhere, defendants MCGOWAN, VANCE, DREW, KRUSKA, and MONTOYA, together with others known and unknown to the Grand Jury, knowingly conspired, combined, and agreed to commit the following offenses against the United States:

a.   Knowingly, and with intent to deceive, to cause locked-out employees to falsely represent social security numbers to be the social security numbers assigned to them by SSA, when, in truth and in fact, those social security numbers had not been assigned to them by SSA, in violation of Title 42, United States Code, Section 408(a)(7)(B) and Title 18, United States Code, Section 2;

b.   Knowingly, and with intent to commit and to aid and abet unlawful activity constituting violations of Federal law as set forth in paragraph 41 below, to cause locked-out employees to transfer and use, without lawful authority, in and affecting interstate commerce, means of identification of other persons, in violation of Title 18, United States Code, Sections 1028(a)(7) and 2; and

c.   Knowingly and willfully to falsify, conceal, and cover up, and cause others to falsify, conceal, and cover up, by trick, scheme, and device, material facts within the jurisdiction of SSA and IRS, agencies of the executive branch of the United States government, in violation of Title 18, United States Code, Sections 1001(a)(1) and 2.

41.   In causing locked-out employees to transfer and use other individuals' names, social security numbers, and other means of identification during the lockout, defendants MCGOWAN, VANCE, DREW, KRUSKA, and MONTOYA, together with others known and

17

unknown to the Grand Jury, intended to commit, and intended to
and did aid and abet, the following unlawful activity that
constituted violations of Federal law:

      a.  Causing locked-out employees to falsely complete
IRS Forms W-4 using other individuals' names and social security
numbers, and signing these false forms under penalty of perjury,
in violation of Title 26, United States Code, Section 7205(a) and
Title 18, United States Code, Section 1001(a)(2);

      b.  Issuing materially false IRS Forms W-2 to
locked-out employees who worked during the lockout using other
individuals' means of identification, in violation of Title 26,
United States Code, Section 7204;

      c.  Filing these materially false IRS Forms W-2 with
SSA, knowing that SSA would subsequently furnish these false
forms to IRS, in violation of Title 18, United States Code,
Section 1001(a)(2);

      d.  Concealing from SSA and IRS the true and actual
amounts of income received in 2003 by locked-out employees who
worked for Ralphs during the lockout using other individuals'
means of identification, in violation of Title 18, United States
Code, Section 1001(a)(1); and

      e.  Concealing from SSA and IRS the true identities of
locked-out employees who worked during the lockout using other
individuals' means of identification, in violation of Title 18,
United States Code, Section 1001(a)(1).

III.

**THE MANNER AND MEANS OF THE CONSPIRACY**

42.   The objects of the conspiracy were achieved in the following manner and by the following means, among others:

**A.   RALPHS' CORPORATE POLICY REGARDING THE HIRING OF LOCKED-OUT EMPLOYEES**

43.   In or about the Summer of 2003, Ralphs began preparing for a possible labor action by the Unions.

44.   As part of its preparation, in or about September 2003, Ralphs distributed a confidential strike manual to its non-union management personnel that set forth the procedures and policies to be followed in the event of such a labor action.   The strike manual stated in part:

> Under no circumstances should [Store Directors] ***knowingly hire*** members from the striking bargaining unit.   This would include striking union members employed by competitors involved in the labor dispute.   In order to leverage our bargaining position, we must enforce this policy. (bold and italics added).

45.   This policy came to be known within Ralphs as the "not knowingly hire" policy.   Because this policy did not absolutely and unequivocally prohibit the hiring of locked-out and striking employees in all circumstances, it could be, and was, applied by the Conspirators, including defendants MCGOWAN, VANCE, DREW, KRUSKA, and MONTOYA, to allow Store Directors to hire locked-out and striking employees if they could plausibly deny knowing that applicants for temporary replacement positions were union members.

46.   In fact, Ralphs' senior management, including defendant MCGOWAN, and Zone Managers, including defendants VANCE, DREW,

1  KRUSKA, and MONTOYA, used the "not knowingly hire" policy to
2  justify the hiring of locked-out and striking employees as
3  temporary replacement workers so long as there was a plausible
4  basis for denying knowledge of the employees' status.  This
5  understanding resulted from a number of facts and circumstances,
6  including the following:

7         a.   In explaining the "not knowingly hire" policy to
8  their subordinates, Ralphs' senior management, including
9  defendant MCGOWAN, and Zone Managers, including defendants VANCE,
10 DREW, KRUSKA, and MONTOYA, emphasized the word "knowingly" in
11 order to implicitly invite non-compliance with the policy.

12        b.   Leading up to and during the lockout, defendants
13 MCGOWAN, VANCE, DREW, KRUSKA, and MONTOYA made other statements
14 and comments to their subordinates indicating that that Store
15 Directors should hire locked-out employees as necessary to help
16 operate their stores.

17        c.   When defendants MCGOWAN, VANCE, DREW, KRUSKA and
18 MONTOYA visited stores during the lockout and recognized locked-
19 out employees working, they did not instruct the Store Directors
20 to immediately terminate these employees, nor did they take any
21 action against the Store Directors for having hired such
22 employees in violation of the "not knowingly hire" policy.

23 B.   RECRUITMENT OF LOCKED-OUT EMPLOYEES TO WORK DURING THE
         LOCKOUT
24

25      47.  Leading up to and during the lockout, the Conspirators,
26 including defendants MCGOWAN, VANCE, DREW, KRUSKA, and MONTOYA,
27 directed Store Directors to identify "experienced" grocery
28 workers who might be willing to work during a strike or lockout

1  and/or instructed Store Directors to hire locked-out workers
2  referred to the Store Directors by the defendants.
3       48.  Defendant KRUSKA and others also attempted and
4  instructed others to attempt to assemble "roving teams" of
5  grocery workers who could assist at different stores within a
6  Zone in the event of a strike or lockout.
7       49.  In meetings with Store Directors before the lockout, a
8  number of the Conspirators, including defendants MCGOWAN and
9  KRUSKA, suggested that Store Directors could hire locked-out
10 employees as temporary replacement workers as long as the Store
11 Directors could plausibly deny knowing that the applicants were
12 locked-out employees.
13      50.  Locked-out employees who wanted to return to work were
14 told by the Conspirators and others, including defendants VANCE,
15 DREW, and MONTOYA, that they could work during the lockout if
16 they agreed to use a false name and social security number.
17 **C.   HIRING OF LOCKED-OUT EMPLOYEES UNDER FALSE NAMES, SOCIAL
       SECURITY NUMBERS, AND DOCUMENTATION**
18
19      51.  During the lockout, in order to secure the employment
20 of well-trained, experienced, and reliable grocery workers,
21 defendants MCGOWAN, VANCE, KRUSKA, DREW, MONTOYA, and others,
22 knowingly directed, instructed, caused, and approved the hiring
23 of hundreds of locked-out employees under false names, social
24 security numbers, and documentation.  These locked-out employees
25 were hired in the following ways, among others:
26           a.   Some locked-out employees were hired and worked as
27 temporary replacement workers at the stores at which they
28 regularly worked (their "home stores").

21

b.   Some locked-out employees were hired as temporary replacement workers at their home stores, and then assigned to other stores at which they worked as temporary replacement workers in order to avoid detection by the Unions and locked-out workers in and around the locked-out workers' home stores.

c.   Some locked-out employees were referred by their supervisors at their home stores to other stores at which they were hired and worked as temporary replacement workers, also in order to avoid detection by the Unions and locked-out workers in and around the locked-out workers' home stores.

d.   Some locked-out employees approached Store Directors or Zone Managers at stores other than their home stores, on their own initiative, and were hired and worked as temporary replacement workers at the other stores.

52.   As defendants MCGOWAN, VANCE, DREW, KRUSKA, and MONTOYA well knew, locked-out employees who agreed to work during the lockout had to work under false names and social security numbers, or else they could not be entered into HRIS.  Locked-out employees who worked during the lockout chose, or were provided, false names and social security numbers in the following ways, among others:

a.   Some locked-out employees were hired as temporary replacement workers under the names and social security numbers of family members, such as a spouse, child, brother, or sister.

b.   Some locked-out employees were hired as temporary replacement workers under entirely fictitious names and social security numbers.

c.   Some locked-out employees were hired as temporary

1  replacement workers under altered versions of their true names
2  and social security numbers.

3      53.   The hiring of locked-out employees to work during the
4  lockout under false names and social security numbers as
5  directed, instructed, approved, and caused by defendants MCGOWAN,
6  VANCE, DREW, KRUSKA, MONTOYA, and others, resulted in:

7          a.   Payroll Authorities listing false names and social
8  security numbers for applicants;

9          b.   INS Forms I-9, Section 1, listing false names,
10  social security numbers, dates of birth, and addresses;

11          c.   INS Forms I-9, Section 2, containing false
12  certifications under penalty of perjury that the Ralphs
13  representative personally examined genuine identification
14  documents presented by applicants who were locked-out employees;

15          d.   INS Forms I-9 that were not completed for
16  applicants who were locked-out employees in violation of Ralphs'
17  legal obligation to complete this form whenever it hired any new
18  worker;

19          e.   Temporary Work Employment Applications submitted
20  by locked-out worker applicants listing false names, social
21  security numbers, dates of birth, addresses, and employment
22  histories; and

23          f.   IRS Forms W-4 listing false names, social security
24  numbers, and addresses, and signed by the locked-out worker
25  applicants under penalty of perjury.

26      54.   The hiring of locked-out employees under false names
27  and false social security numbers as directed, instructed,
28  approved, and caused by defendants MCGOWAN, VANCE, DREW, KRUSKA,

1   MONTOYA, and others, resulted in the entry of false information

2   into HRIS including, among other things, false names, social

3   security numbers, dates of birth, and addresses, as well as false

4   information that applicants were not bargaining unit members and

5   were not eligible to receive employee benefits.

6   D.   ISSUANCE OF PAYROLL CHECKS IN FALSE NAMES TO LOCKED-OUT
        EMPLOYEES WHO WORKED UNDER FALSE NAMES AND SOCIAL SECURITY
7       NUMBERS

8        55.  Ralphs paid replacement workers by check on a weekly

9   basis for work performed during the preceding week.  The checks

10  were delivered to temporary replacement workers at their store of

11  employment from Ralphs' corporate headquarters in Compton,

12  California.

13       56.  During the lockout, defendants MCGOWAN, VANCE, DREW,

14  KRUSKA, MONTOYA, and others, caused Ralphs to issue hundreds of

15  weekly paychecks to locked-out employees who were working under

16  false names and social security numbers.

17  E.   THE CONSPIRATORS' DELIBERATE ACTIONS TO CONCEAL THE HIRING
        OF LOCKED-OUT EMPLOYEES FROM THE UNIONS

18

19       57.  During the lockout, defendants MCGOWAN, VANCE, DREW,

20  KRUSKA, MONTOYA, and others, concealed Ralphs' hiring of locked-

21  out employees from the Unions and others by, among other things:

22            a.   Requiring locked-out employees who returned to

23  work during the lockout to adopt and use false names when working

24  in their assigned stores, including wearing name badges

25  displaying their false names.

26            b.   Causing locked-out employees to work at stores

27  other than their home stores, including in many instances stores

28  that were considerable distances from the locked-out employees'

home stores.

      c.   Causing locked-out employees to perform tasks that kept them away from the front of the store, or to work shifts when the stores were closed to the public.

      d.   Using code words, such as "experienced workers," "experienced help," "skilled workers," "skilled help," and "Radio Shack" employee, when communicating with each other about the recruitment and hiring of locked-out employees.

      e.   Causing the falsification of Ralphs' hiring and employment records to conceal and disguise the hiring of locked-out employees in the event the Unions were able to obtain access to those records.

      f.   Causing Ralphs to under-report hours worked by the locked-out employees during the lockout to the administrators of two joint employer-union administered benefit funds that provided, among others, pension and medical benefits.  As a result, Ralphs contributed substantially less than was required to the two joint employer-union administered benefit funds.

**F.   <u>ISSUANCE AND FILING OF FALSE TAX DOCUMENTS</u>**

     58.  In or about mid-January 2004, defendants MCGOWAN, VANCE, DREW, KRUSKA, and MONTOYA, together with others, caused Ralphs to issue hundreds of materially false IRS Forms W-2 for 2003.  These forms were false in the following ways, among others:

      a.   IRS Forms W-2 issued to locked-out employees who worked during the lockout under fictitious names and social security numbers: (i) falsely stated the employees' names, social security numbers, and addresses; (ii) falsely attributed the

1   income the employees received during the lockout to fictitious
2   persons; and (iii) falsely applied the social security
3   contributions withheld from such income to non-existent social
4   security accounts of fictitious persons.

5        b.   IRS Forms W-2 issued to locked-out employees who
6   worked during the lockout under the names and social security
7   numbers of other persons: (i) falsely stated the employees'
8   names, social security numbers, and in some instances addresses;
9   (ii) falsely reported the income the employees had received
10  during the lockout as having been earned by other persons; and
11  (iii) falsely applied the social security contributions withheld
12  from such income to the social security accounts of other
13  persons.

14       c.   IRS Forms W-2 issued in the true names of locked-
15  out employees who worked during the lockout for work performed
16  prior to the lockout: (i) falsely under-reported the total amount
17  of income the employees had received during 2003, by omitting the
18  income they had received during the lockout; and (ii) falsely
19  understated the amount of social security contributions that
20  should have been withheld from the employees' total annual
21  income.

22      59.   In or about March 2004, Ralphs electronically filed
23  copies of these false IRS Forms W-2 with SSA, for processing by
24  SSA.

25      60.   In or about May 2004, SSA electronically furnished the
26  false IRS Forms W-2 to IRS, for processing by IRS.

27

28

## IV.

### OVERT ACTS

61.    In furtherance of the conspiracy, and to accomplish its objects, defendants MCGOWAN, VANCE, DREW, KRUSKA, and MONTOYA, together with others known and unknown to the Grand Jury, committed and caused others to commit the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1: In or about August and/or September 2003, MCGOWAN and others held one or more meetings at Ralphs' corporate headquarters attended by Zone Managers, including VANCE, DREW, KRUSKA, and MONTOYA, at which copies of the confidential strike manual containing the "not knowingly hire" policy were provided to Zone Managers for distribution to their Store Directors;

Overt Act No. 2: In or about September 2003, at a meeting of store directors in Zone 1, KRUSKA instructed his Store Directors that locked-out employees hired as temporary replacement workers should use false names, stating, "Tom can't be Tom or the system will catch it" and "Cindy can't be Cindy."

Overt Act No. 3: In or about late September 2003, KRUSKA instructed the Store Director for Store No. 118 in Murrieta, California to organize a roving team of locked-out employees who could stock the shelves of Ralphs stores at night throughout KRUSKA's Zone 1 in the event of a labor action.

Overt Act No. 4: In or about late September 2003, MCGOWAN visited Store No. 296 in Anaheim, California and asked the Store Director if the Store Director had hired any "aces," to

which the Store Director responded that he hired experienced people from food chains and stores not involved in the strike. In response, MCGOWAN said "no, people who know our system," emphasizing "our."

Overt Act. No. 5: In or about late September 2003, MONTOYA visited Store No. 296 in Anaheim, California and asked the Store Director if he had enough temporary workers in place for the coming strike. The Store Director told MONTOYA that the Store Director had not hired enough temporary employees, to which MONTOYA responded that the Store Director would have to look for more "experienced" help. MONTOYA further stated that the Store Director knew people who lived far enough away from his Anaheim store, people who "knew what they were doing," and that the Store Director should do whatever it took to keep the store running.

Overt Act No. 6: In or about late September or early October 2004, in a meeting of Store Directors in Zone 4 in preparation for the anticipated labor dispute, DREW described the coming strike as a "war" with the Unions and instructed his Store Directors to do whatever it took to run the business in their stores during the strike.

Overt Act No. 7: In or about late September or early October 2003, MCGOWAN directed the Zone Manager for Zone 5 to instruct his Store Directors to determine whether their grocery workers would be willing to work in the event of a labor action.

Overt Act No. 8: In or about late September or early October 2003, MCGOWAN told the Zone Manager for Zone 5 that union members recruited from Vons or Albertsons to work as temporary replacement workers at Ralphs stores should falsely state in

their temporary employment applications that they had previously worked at "Radio Shack," instead of at Vons or Albertsons.

Overt Act No. 9: In or about late September or early October 2003, MCGOWAN directed the Zone Manager for Zone 5 to instruct the Store Director for Store No. 108 in La Jolla, California to ask his grocery workers, particularly his key persons, whether they would be willing to work on a roving crew that would assist at various Ralphs stores in Zone 5 in the event of a lockout.

Overt Act No. 10: In or about early October 2003, MCGOWAN had a conversation with the Store Director of Store No. 187 in Tustin, California during which MCGOWAN said, in reference to Ralphs' policy regarding the hiring of locked-out and striking employees, "Now you've been through a strike and now you know what you really need to do to staff your store," or words to that effect.

Overt Act No. 11: In or about early-October 2003, VANCE told the Store Director for Store No. 13 in Rancho Cucamonga, California that VANCE needed help; that a locked-out employee from Store No. 13 could work at Store No. 195 in La Quinta, California; and that VANCE could authorize the hiring of locked-out employees because the direction came from people to whom VANCE reported, which included MCGOWAN.

Overt Act No. 12: In or about early October 2003, a co-conspirator who was the Store Director for Store No. 705 in Los Angeles, California asked a locked-out worker from Store No. 705 if the locked-out worker would "do a favor" for DREW and work during the anticipated strike/lockout under the identification of

another person.

Overt Act NO. 13: In or about October 10, 2003, a co-conspirator who was the Store Director for Store No. 705 in Los Angeles, California hired the locked-out worker from Store No. 705 to work as a temporary employee during the anticipated strike/lockout under a false name and social security number.

Overt Act No. 14: Between on or about October 12, 2003, and on or about October 31, 2003, MCGOWAN told the Zone Manager for Zone 7 that the Zone Manager should recruit "experienced" workers to improve the conditions in Zone 7 stores.

Overt Act No. 15: Between on or about October 12, 2003 and in or about January 2004, VANCE told the Store Director for Store No. 145 in Riverside, California, the store at which VANCE maintained his office, that the "coast was clear" and that the "powers that be" had authorized the hiring of locked-out employees.

Overt Act No. 16: In or about mid-October 2003, VANCE placed a telephone call to the Store Director for Store No. 609 in Riverside, California and told the Store Director to hire the wife of VANCE, whom the Store Director and VANCE knew was a locked-out employee, at Store No. 609 because VANCE needed his wife to work during the lockout at several stores throughout VANCE's Zone.

Overt Act No. 17: On or about October 17, 2003, MCGOWAN instructed the Zone Manager for Zone 5 to have the Store Director for Store No. 168 in Encinitas, California terminate a locked-out employee who was discovered by a data comparison run comparing the identities of Ralphs temporary replacement workers and

1  locked-out Albertsons and striking Vons employees.   While

2  directing the termination, MCGOWAN assured the Zone Manager that

3  the data comparison run was "a one-time purge, if you know what I

4  mean," or words to that effect.

5       Overt Act No. 18: On or about October 18, 2003, VANCE

6  gave the Store Director for Store No. 609 in Riverside,

7  California a temporary employment application and other documents

8  to hire VANCE's wife, whom the Store Director and VANCE knew was

9  a locked-out employee at Store No. 609.   The name and social

10 security number used in the hiring of VANCE's wife, and entered

11 into HRIS by the Store Director at VANCE's instruction, was that

12 of the son of VANCE's wife.

13      Overt Act No. 19: On or about October 22, 2003, DREW

14 told a locked-out worker from Store No. 210 in Los Angeles,

15 California who had recently been selected as the most recent

16 Ralphs courtesy clerk of the year, that DREW could arrange for

17 the locked-out worker to work at a Ralphs store in Pasadena,

18 California.   At that time, DREW asked if the locked-out worker

19 had the social security number of another person that he could

20 use.   In response, the locked-out worker told DREW that he did

21 not have anyone else's social security number that he could use

22 to work.   DREW then instructed the locked-out worker to contact a

23 co-conspirator who was the Store Director for Store No. 743 in

24 Pasadena, and provided the locked-out worker with the name and

25 telephone number of that Store Director.

26      Overt Act No. 20: On or about October 23, 2003, the

27 locked-out worker from Store No. 210, on instructions from DREW,

28 met with a co-conspirator who was the Store Director for Store

No. 743, at which time the Store Director asked whether the locked-out worker was the "Malcolm" the Store Director had discussed with DREW.  Upon learning that the locked-out worker did not have access to a social security number under which to work, the Store Director made arrangements for the locked-out worker to work under the false name "Cornell Cole" and instructed the locked-out worker to report to work at Store No. 743 the next day.

Overt Act No. 21: In or about October 2003, DREW, in the context of a discussion with the Store Director for Store No. 210 in Los Angeles, California about the Store Director's need for temporary replacement workers in his store, instructed the Store Director to "call his buddies," to ask if they could send temporary replacement workers, including locked-out retail clerks, to work at Store No. 210.

Overt Act No. 22: On or about October 26, 2003, a co-conspirator who was the Store Director for Store No. 743 in Pasadena, California called a female locked out worker from Store No. 743 and asked if she was ready to return to work during the lockout because the people who returned to work "would be taken care of."  Upon receiving a positive response from the locked-out worker, the Store Director for Store No. 743 instructed the locked-out worker to report for work that evening at Store No. 210 in Los Angeles and indicated that she would need to use a false social security number for payroll purposes.

Overt Act No. 23: In or about late October 2003, MONTOYA asked the Zone Manager for Zone 5 "if a store director wanted to hire a locked-out worker, what should they do."  In

1   response, the Zone Manager for Zone 5 informed MONTOYA that
2   locked-out employees should work (a) under names and social
3   security numbers of family members, and (b) at stores other than
4   their home stores.

5          Overt Act No. 24: On or about October 31, 2003
6   through early January 2004, KRUSKA called the Store Director for
7   Store No. 118 in Murrieta, California with instructions for where
8   to send the roving crew of locked-out employees, whom KRUSKA had
9   earlier directed the Store Director to assemble, to stock the
10  shelves of Ralphs stores in Zone 1 that were in need of
11  assistance after the picket lines were removed from Ralphs
12  stores.

13         Overt Act No. 25: In or about early November 2003,
14  MCGOWAN, after inspecting a store in Zone 8 that MCGOWAN
15  described as "like Disneyland" and reportedly had six
16  "experienced" workers, instructed KRUSKA to contact the Zone
17  Manager for Zone 5 about obtaining more "experienced" workers in
18  his Zone 1.

19         Overt Act No. 26: In or about early November 2003,
20  KRUSKA told the Store Director for Store No. 103 in San Diego,
21  California that KRUSKA had instructed a locked-out employee from
22  Store No. 108 in La Jolla, California who was interested in
23  working to contact the Store Director.  KRUSKA further instructed
24  the Store Director that the Store Director should not hire the
25  locked-out employee under his true name, but that when the Store
26  Director entered the locked-out employee into the HRIS system, a
27  "six" could easily become a "nine" and "Suzie" could easily
28  become a "Sally."

1    Overt Act No. 27: In or about November 2003, MCGOWAN,

2  while inspecting Store No. 163 in San Juan Capistrano,

3  California, told the Store Director that he needed to "start

4  networking with your friends in San Diego," about the hiring of

5  temporary replacement workers, including locked-out workers.

6    Overt Act No. 28: In or about November 2003, DREW spoke

7  with a locked-out worker from Store No. 745 in Newport Beach,

8  California who was also the half-brother of DREW, about the

9  locked-out worker's desire to work during the lockout.  At that

10  time, DREW and the locked-out worker from Store No. 745 discussed

11  that the locked-out worker would need to use a false name and

12  social security number to do so.  Soon thereafter, the locked-out

13  worker from Store No. 745 informed DREW that the locked-out

14  worker had received permission to use the name and social

15  security number of his father.  In response, DREW told the

16  locked-out worker that DREW had made arrangements with "Kelley"

17  for the locked-out worker to work in "Kelley's" store.

18    Overt Act No. 29: In or about November 2003, MONTOYA

19  told a locked-out employee from Store No. 650 in Huntington

20  Beach, California that some Store Directors were doing some

21  creative things with hiring so that the union would not know who

22  was working during the lockout.  MONTOYA further told the locked-

23  out employee that if the employee decided to work during the

24  lockout, she would need to use the name and social security

25  number of another person when returning to work because the

26  Unions were checking whether Ralphs was rehiring locked-out

27  employees.

28    Overt Act No. 30: In or about November 2003, MONTOYA

34

1  authorized the locked-out employee from Store No. 650 in

2  Huntington Beach, California to return to work at Store No. 72 in

3  Fullerton, California knowing the person to be a locked-out

4  employee.

5      Overt Act No. 31: In or about November 2003, MONTOYA

6  reassured the locked-out employee from Store No. 650 in

7  Huntington Beach, California, within Zone 8, that she would not

8  lose her recent promotion if it was discovered by the Zone

9  Manager for Zone 8 that she had worked during the lockout because

10  MONTOYA had exchanged locked-out employees with the Zone Manager

11  for Zone 8.

12      Overt Act No. 32: In or about November 2003, MCGOWAN,

13  in response to a request by the Zone Manager for Zone 7 for

14  further clarification regarding the "not knowingly hire" policy,

15  stated, in substance, that a temporary employment application

16  suggesting that the applicant might be a locked-out or striking

17  employee should be returned to the applicant as unacceptable, and

18  that the applicant should then be offered another application to

19  complete, in which the applicant would not reveal that he or she

20  was a locked-out or striking employee.

21      Overt Act No. 33: In or about November 2003, MCGOWAN

22  told the Store Director for Store No. 167 in San Diego,

23  California that social security numbers of temporary replacement

24  workers were no longer being checked.

25      Overt Act No. 34: In or about mid-November 2003, KRUSKA

26  instructed the Store Director for Store No. 159 in San Diego,

27  California that a locked-out employee who was working in Store

28  No. 159 under her true name and social security number would

thereafter need to work under the identification of a relative.
KRUSKA explained by way of example: "Dana can't be Dana, but Dana
could become Dana's mom or son."

Overt Act No. 35: Between on or about October 12, 2003
and January 2004, KRUSKA walked through Store No. 159 in San
Diego, California with a locked-out employee whom KRUSKA knew to
be locked out and gave the locked-out employee instructions
relating to the management of the store.

Overt Act No. 36: In or about late November 2003, VANCE
told the Store Director for Store No. 195 in La Quinta,
California that it was okay to hire two locked-out employees
referred to the Store Director by the Produce Supervisor for Zone
3, and told the Store Director that the Store Director should use
the social security numbers of a sibling or spouse of the two
locked-out employees in order to place them on Ralphs' payroll.

Overt Act No. 37: In or about late November or early
December 2003, during a visit to Store No. 34 in Laguna Niguel,
California, MCGOWAN thanked two temporary replacement workers,
whom MCGOWAN knew to be locked-out employees, for working during
the lockout.

Overt Act No. 38: In or about November or December
2003, MCGOWAN entered Store No. 187 in Tustin, California while
the Store Director was at lunch.  When MCGOWAN saw the wife of
the Store Director for Store No. 163 (whom he knew to be a
locked-out employee) working as a temporary replacement worker in
the front portion of the store, he immediately left the store.
MCGOWAN then called a co-conspirator who was the Zone Manager for
Zone 8 and told him to tell the Store Director for Store No. 187

to be more careful about whom he left in charge of the front, public, portion of the store while he, the Store Director, was away from the store.

Overt Act No. 39: In or about November or December 2003, VANCE told a locked-out employee who had been working during the lockout under her true name and social security number at Store No. 609 in Riverside, California to start using the name and social security number of a family member if she wanted to continue to work during the lockout.

Overt Act No. 40: In or about late November or early December 2003, MONTOYA told the Store Director for Store No. 135 in Anaheim, California, the store at which MONTOYA maintained her office, that the Store Director was going to get an "experienced" person to fill out a temporary work employment application and that the Store Director should hire the applicant. At that time, MONTOYA instructed the Store Director that the applicant should refer to "Radio Shack" or "Staples" on the application.

Overt Act No. 41: In or about late December 2003 or early January 2004, DREW spoke with the locked-out worker from Store No. 745, who was also the half-brother of DREW, and told the locked-out worker that it was not a good idea for the locked-out worker to work during the lockout any longer and terminated the locked-out worker.

Overt Act No. 42: In or about early January 2003, after publication of newspaper articles regarding the hiring of locked-out workers at certain Ralphs stores in Southern California, KRUSKA instructed the Store Director for Store No. 159 in San

37

Diego, California to tell a locked-out employee working in Store No. 159 to take some time off.

Overt Act No. 43: On or about January 9, 2004, MCGOWAN told the Store Director for Store No. 163 in San Juan Capistrano, California, whose name had appeared in newspaper articles regarding the hiring of locked-out workers at certain Ralphs stores in Southern California, that the Store Director was being suspended with pay, but that he absolutely was not to tell anybody, including his wife, what was happening or that he was on suspension.

Overt Act No. 44: On or about January 9, 2004, MCGOWAN told the Zone Manager for Zone 5 that: (a) Ralphs could not protect Store Directors who had hired locked-out employees under false names and social security numbers; (b) any resulting adverse consequences to Store Directors were "just part of the job," or words to that effect; and (c) the Zone Manager should "stay strong," or words to that effect.

Overt Act No. 45: On or about March 23, 2004, MCGOWAN falsely told lawyers for Ralphs investigating allegations of unlawful hiring during the lockout that MCGOWAN learned of a locked-out employee working at Store No. 108 in La Jolla, California on October 18, 2003, and instructed the Zone Manager for Zone 5 to dismiss the employee.

Overt Act No. 46: In or about March or April 2004, MCGOWAN falsely claimed in a conversation with the Zone Manager for Zone 5 that on October 18, 2003: (a) MCGOWAN and the Zone Manager together had seen a locked-out price integrity auditor working at Store No. 108 in La Jolla; and (b) MCGOWAN had

instructed the Zone Manager to terminate the locked-out employee at that time.

Overt Act No. 47: On or about May 20, 2004, VANCE falsely told lawyers for Ralphs investigating allegations of unlawful hiring during the lockout that VANCE had not encouraged any of his Store Directors to hire locked-out workers during the lockout; that he was not aware of stores in his zone swapping locked-out workers who were working under false identities; and that his wife, who was a locked-out worker, had not worked at Ralphs stores during the lockout.

Overt Act No. 48: On or about October 13, 2004, DREW falsely told lawyers for Ralphs investigating allegations of unlawful hiring during the lockout that DREW had heard rumors that his half-brother, a locked-out worker from Store No. 745 in Newport Beach, was working in Store No. 705 in Los Angeles, and that DREW did not know whether his half-brother worked during the lockout.

Overt Act No. 49: On or about March 31, 2005, VANCE falsely represented to Special Agents of the United States Department of Labor, Office of Inspector General, that he never authorized the hiring of locked-out workers by Store Directors in his Zone, Zone 3, with the exception of the hiring of his wife at Store Number 609.

**COUNTS TWO THROUGH TWELVE**

[42 U.S.C. § 408(a)(7)(B) and 18 U.S.C. § 2]

62.    The Grand Jury hereby repeats and realleges paragraphs 1 through 39 and 42 through 60 of this Indictment.

63.    During the lockout, defendants MCGOWAN, VANCE, DREW, KRUSKA, and MONTOYA, and others known and unknown to the Grand Jury, caused hundreds of locked-out employees to adopt and use false social security numbers for a number of purposes, including:

         a.    To enable Ralphs to rehire locked-out employees as temporary replacement workers;

         b.    To enable Ralphs to employ skilled and experienced employees at its stores during the lockout;

         c.    To enable Ralphs to conceal its employment of locked-out employees from their Unions and from fellow union members; and

         d.    To enable Ralphs to conceal its illegal conduct from the NLRB, SSA, IRS, and other governmental agencies.

64.    During the approximate periods specified below, in the Central District of California and elsewhere, the defendants specified below, aided and abetted by others known and unknown to the Grand Jury, knowingly, with intent to deceive, and for the purposes set forth in paragraph 63 above, caused the locked-out employees with the following initials to falsely represent the following numbers to be the social security numbers assigned to them by the Commissioner of Social Security, when, in truth and fact, as the defendants well knew, those numbers were not the social security numbers assigned to the locked-out employees by

the Commissioner of Social Security:

| COUNT | DEFENDANT | TIME PERIOD | LOCKED-OUT EMPLOYEE | FALSE SSN |
|-------|-----------|-------------|---------------------|-----------|
| TWO | MCGOWAN | 9/29/03 - 1/02/04 | "W.H." | XXX-XX-0207 |
| THREE | MCGOWAN | 10/18/03 - 2/19/04 | "M.C." | XXX-XX-6675 |
| FOUR | MCGOWAN | 10/1/03 - 1/22/04 | "D.L." | XXX-XX-7843 |
| FIVE | VANCE, MCGOWAN | 10/18/03 - 1/22/04 | "J.V." | XXX-XX-7879 |
| SIX | VANCE, MCGOWAN | 10/10/03 - 1/22/04 | "C.C." | XXX-XX-6077 |
| SEVEN | DREW | 10/23/03 - 1/02/04 | "M.I." | XXX-XX-6294 |
| EIGHT | DREW | 10/20/03 - 12/18/03 | "S.M." | XXX-XX-9218 |
| NINE | KRUSKA, MCGOWAN | 11/12/03 - 1/22/04 | "N.V.A." | XXX-XX-5471 |
| TEN | KRUSKA, MCGOWAN | 12/17/03 - 1/22/04 | "S.M." | XXX-XX-0663 |
| ELEVEN | MONTOYA, MCGOWAN | 10/05/03 - 2/19/04 | "E.W." | XXX-XX-6511 |
| TWELVE | MONTOYA, MCGOWAN | 9/30/03 - 1/22/04 | "R.K." | XXX-XX-4870 |

## COUNTS THIRTEEN THROUGH TWENTY-ONE

[18 U.S.C. §§ 1028(a)(7) and 2]

65. The Grand Jury hereby repeats and realleges paragraphs 1 through 39 and 42 through 60 of this Indictment.

66. During the approximate periods specified below, in the Central District of California and elsewhere, the defendants specified below, aided and abetted by others known and unknown to the Grand Jury, knowingly, and with intent to commit and to aid and abet unlawful activity constituting violations of Federal law, as set forth in paragraph 41 above, caused each of the following locked-out employees to transfer and use, without lawful authority, in and affecting interstate commerce, the means of identification of another person, as described below:

| COUNT | DEFENDANT | TIME PERIOD | LOCKED-OUT EMPLOYEE | MEANS OF IDENTIFICATION |
|-------|-----------|-------------|---------------------|-------------------------|
| THIRTEEN | MCGOWAN | 11/10/03-1/2/04 | "R.M." | Social security number XXX-XX-6758, a valid social security number issued to a person other than "R.M." |
| FOURTEEN | VANCE, MCGOWAN | 11/18/03-1/31/04 | "E.C." | Social security number XXX-XX-0956, a valid social security number issued to a person other than "E.C." |
| FIFTEEN | VANCE, MCGOWAN | 11/2/03-1/22/04 | "M.V." | Social security number XXX-XX-9426, a valid social security number issued to a person other than "M.V." |

| COUNT | DEFENDANT | TIME PERIOD | LOCKED-OUT EMPLOYEE | MEANS OF IDENTIFICATION |
|---|---|---|---|---|
| SIXTEEN | DREW | 11/4/03-1/14/04 | "K.D." | Social security number XXX-XX-4853, a valid social security number issued to a person other than "K.D." |
| SEVENTEEN | DREW | 10/10/03-1/19/04 | "M.J." | Social security number XXX-XX-4259, a valid social security number issued to a person other than "M.J." |
| EIGHTEEN | KRUSKA, MCGOWAN | 11/17/03-1/1/04 | "D.H." | Social security number XXX-XX-6569, a valid social security number issued to a person other than "D.H." |
| NINETEEN | KRUSKA, MCGOWAN | 11/8/03 - 1/22/04 | "C.J." | Social security number XXX-XX-2617, a valid social security number issued to a person other than "C.J." |
| TWENTY | MONTOYA, MCGOWAN | 11/5/03-1/22/04 | "C.H." | Social security number XXX-XX-4379, a valid social security number issued to a person other than "C.H." |
| TWENTY-ONE | MONTOYA, MCGOWAN | 10/2/03-1/22/04 | "S.O." | Social security number XXX-XX-1998, a valid social security number issued to a person other than "S.O." |

**COUNT TWENTY-TWO**

[18 U.S.C. §§ 1001(a)(1) and 2]

67.   The Grand Jury hereby repeats and realleges paragraphs 1 through 39 and 42 through 60 of this Indictment.

68.   Beginning in or about September 2003, and continuing until in or about March 2005, in the Central District of California and elsewhere, defendants MCGOWAN, VANCE, DREW, KRUSKA, and MONTOYA, knowingly and willfully falsified, concealed, and covered up, and caused others to falsify, conceal, and cover up, by trick, scheme, and device, the following material facts in a matter within the jurisdiction of SSA and IRS, agencies of the executive branch of the United States government:

   a.   The true and correct identities and social security numbers of locked-out employees who worked for Ralphs during the lockout under false names and social security numbers;

   b.   The true and correct amounts of income received in 2003 by locked-out employees who worked for Ralphs during the lockout under false names and social security numbers;

   c.   The true and correct amounts of social security contributions that should have been withheld from wages received in 2003 by locked-out employees who worked for Ralphs during the lockout;

   d.   The true and correct amounts of income received in 2003 by people whose names and social security numbers were used by locked-out employees who worked for Ralphs during the lockout;

   e.   The true and correct amounts of withheld social security contributions to be applied in 2003 to social security

44

1 accounts of people whose names and social security numbers were

2 used by locked-out employees who worked for Ralphs during the

3 lockout; and

4        f.   The fact that no federal income taxes should have

5 been withheld by Ralphs for people who did not work for Ralphs in

6 2003, but whose names and social security numbers were used by

7 locked-out employees who worked for Ralphs during the lockout.

8     69.   Defendants MCGOWAN, VANCE, DREW, KRUSKA, and MONTOYA

9 falsified, concealed, and covered up, and caused others to

10 falsify, conceal, and cover up, the above facts by and through

11 the following tricks, schemes, and devices:

12        a.   Causing locked-out employees who agreed to work

13 during the lockout to complete IRS Forms W-4 using false names

14 and social security numbers, and to sign these false forms under

15 penalty of perjury;

16        b.   Causing Ralphs to issue IRS Forms W-2 in or about

17 mid-January 2004 for 2003 to locked-out employees who worked

18 during the lockout under false names and social security numbers,

19 which: (i) falsely under-reported the amounts of income received

20 by these employees during 2003; and (ii) falsely understated the

21 amounts of social security contributions that should have been

22 withheld from these employees' earnings;

23        c.   Causing Ralphs to issue IRS Forms W-2 in or about

24 mid-January 2004 for 2003 to people who did not work for Ralphs

25 during 2003, but whose names and social security numbers were

26 used by locked-out employees who worked during the lockout,

27 which: (i) falsely attributed income to these people that they

28 did not receive during 2003; and (ii) falsely applied withheld

1  social security contributions to their social security accounts;

2  and

3         d.   Causing Ralphs to file the false IRS Forms W-2

4  described in subparagraphs b and c above with SSA in or about

5  March 2004, which IRS Forms W-2 defendants MCGOWAN, VANCE, DREW,

6  KRUSKA, and MONTOYA knew or should have reasonably foreseen would

7  later be furnished by SSA to IRS.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT TWENTY-THREE

[18 U.S.C. §§ 1001(a)(2)]

70.    The Grand Jury hereby repeats and realleges paragraphs 1 through 39, 42 through 60, 63 through 64, and 66 of this Indictment.

71.    On or about March 31, 2005, in Riverside County, within the Central District of California, and elsewhere, in a matter within the jurisdiction of the executive branch of the government of the United States, specifically the United States Department of Labor, defendant CHARLES ROBERT VANCE knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation, in that VANCE said to a Special Agent of the United States Department of Labor, Office of Inspector General, Office of Labor Racketeering and Fraud Investigations, that he did not authorize the hiring of locked-out workers at Ralphs stores in his Zone during the October 2003 to February 2004 lockout, with the exception of the hiring of VANCE's wife, when, in truth and in fact, as VANCE then well

//
//
//
//
//
//
//
//
//

knew, he had authorized Store Directors in his Zone to hire many
locked-out workers, in addition to his wife, under false names
and social security numbers.

A TRUE BILL

/S/

Foreperson

GEORGE S. CARDONA
Acting United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

DOUGLAS A. AXEL
Assistant United States Attorney
Chief, Major Frauds Section

BEONG-SOO KIM
Assistant United States Attorney
Deputy Chief, Major Frauds Section

JEREMY D. MATZ
Assistant United States Attorney
Major Frauds Section

STEPHEN A. CAZARES
Assistant United States Attorney
Major Frauds Section